**CARLISLE TIRE AND RUBBER COMPANY, Appellant**

v.

**UNITED STATES CUSTOMS SERVICE, et al.**

**No. 80–1149.**

United States Court of Appeals, District of Columbia Circuit.

Argued 30 Sept. 1980.

Decided 17 Dec. 1980.

Eugene L. Stewart, Washington, D. C., for appellant.

Michael J. Ryan, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before ROBINSON, WILKEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Appellant Carlisle Tire and Rubber Company (Carlisle) seeks to compel disclosure under the Freedom of Information Act (FOIA),[1] of twelve documents held by the United States Customs Service (Customs) relating to Customs' investigation of bicycle tire and tube imports from the Republic of China (Taiwan) and the Republic of Korea (ROK). In late 1977 Carlisle petitioned the Commissioner of Customs to investigate whether the Taiwanese and Korean governments were subsidizing their domestic manufacturers' production and export of bicycle tires and inner tubes to the United States, with hopes that such investigation would lead eventually to imposition of countervailing duties under the Tariff Act of 1930.[2]

---

1. 5 U.S.C. § 552 (1976).

2. 19 U.S.C. § 1303 (1976). At the time, Customs, a division of the United States Department of Treasury, had statutory responsibility under the countervailing duty laws to investigate charges that foreign countries had bestowed "bount[ies] or grant[s] upon the manufacture or production or export of any article[s] or merchandise manufactured or produced in such countr[ies]," 19 U.S.C. § 1303(a)(1) (1976). Customs was further authorized in the course of these investigations to make preliminary, then final, determinations of whether such bounties or grants had in fact been conferred, and if so, what the net amount of such bounties or grants were, 19 U.S.C. § 1303 (1976), *amended by* Trade Agreements Act of 1979, Pub.L.No. 96–39, tit. I, § 103(b)(1), 93 Stat. 190 (26 July 1979). Once a determination had been made that a foreign government had in fact imposed a bounty or grant on a domesti-

In August 1978, following Customs' publication of preliminary determinations in both the Taiwanese and Korean cases, Carlisle requested under FOIA all documentary material held by Customs pertaining to the two determinations. After Customs refused to turn over all documents immediately, Carlisle filed an administrative appeal.[3] Shortly thereafter, Customs partially granted Carlisle's FOIA request with respect to the Taiwanese case only, citing Exemptions 2, 4, and 5 of FOIA as authorization for withholding the remaining requested documents.[4] Carlisle then brought this suit in October 1978 to compel further disclosure.[5]

To buttress its exemption claims, Customs submitted an affidavit sworn by its Assistant Commissioner for Regulations and Rulings explaining its reasons for refusing to disclose the requested information.[6] In response to additional motions over the next five months, the Government filed, *inter alia*, two supplemental affidavits by the same individual.[7] On 21 November

cally produced item later exported to the United States, the United States government could then impose an additional duty on that imported item equal to the net amount of the foreign bounty or grant, 19 U.S.C. § 1303(a)(1) (1976).

Effective 2 January 1980 responsibility for administering the countervailing duty laws shifted to the Secretary of Commerce pursuant to Reorg. Plan No. 3 of 1979, § 5(a)(1)(C), 44 Fed.Reg. 69,273, 69,275 (1979) and Exec.Order No. 12,188, § 1–107(a), 45 Fed.Reg. 989–93 (1980).

3. Under FOIA an agency is accorded 10 working days after the receipt of any request to determine whether to comply and to notify the person making such request of its determination. In "unusual circumstances" the time limits may be extended for no more than 10 additional working days. 5 U.S.C. § 552(a)(6)(A)–(B) (1976).

Carlisle sent its letters of request on 1 August 1978, Appendix (App.) at 76–77 (Taiwan); *id.* at 78–80 (Korea). Customs acknowledged receipt of the FOIA request on 7 August 1978, App. at 81. Construing that acknowledgment as a request for extension of time, Carlisle filed an administrative appeal on 5 September 1978 of Customs' deemed denial of its FOIA request, alleging that no substantive reply to its request had been received within the statutory 20 working day period and requesting that the Commissioner of Customs review the record and order disclosure of the requested documents. *See* Letter from Eugene L. Stewart to Honorable Robert E. Chasen (5 September 1978), *reprinted in* App. at 82–83.

4. 5 U.S.C. §§ 552(b)(2), (4) & (5) (1976).

On 13 October 1978 Customs sent to Carlisle reports and intra-agency memoranda concerning the preliminary countervailing duty determination on bicycle tires and tubes from the Republic of China, excluding documents contained in the Public Reading File. The letter attached to those documents specified that "[t]he enclosed documents represent that portion of the record which is either not exempt from disclosure under the statute or exempt in part and reasonably segregable." Letter from Steven I. Pinter to Eugene L. Stewart (13 October 1978), *reprinted in* App. at 93–94.

5. *See* Brief for the Appellant at 7. Carlisle's complaint was accompanied by a motion to require a detailed justification, itemization, and indexing of the requested documents.

6. *See* Affidavit of Leonard Lehman, Assistant Commissioner (Regulations and Rulings) of the United States Customs Service (19 December 1978), *reprinted in* App. at 25–29 [hereinafter First Lehman Affidavit]. At the same time, Customs disclosed additional documents in whole or in part, attaching an "Index of Documents Withheld" to the First Lehman Affidavit, *reprinted in* App. at 66–67. Of the 13 sequentially numbered documents listed in the index, only Document No. 1 is not in dispute in this lawsuit. *Carlisle Tire & Rubber Co. v. United States Customs Service*, Nos. 78–2001, 78–2002, 79–0224, slip op. at 8 n.1 (D.D.C. 21 Nov. 1979), *reprinted in* App. at 12.

7. Considering the First Lehman Affidavit to be inadequate, Carlisle moved on 29 December 1978 for an order compelling defendants to release all nonexempt documents or nonexempt portions thereof and to identify all documents claimed to be wholly or partially exempt from disclosure. Simultaneously, Carlisle moved to compel the presentation of additional factual information as well as an adequate detailed justification of the claims of exemption and correlation of those claims with specific portions of the subject documents. Brief for the Appellant at 8. Carlisle later filed two sets of interrogatories seeking additional evidence regarding Customs' claims of exemption under 5 U.S.C. §§ 552(b)(1), (4), & (5). *Id.* In a memorandum opinion dated 1 March 1979 Judge Oberdorfer denied Carlisle's motion to compel disclosure and identification but granted Carlisle's motion for detailed information and justification, advising that both parties might file dispositive motions within the month.

Customs then filed two supplemental affidavits by Leonard Lehman, the first pursuant to

1979 District Judge Oberdorfer granted summary judgment for Customs, finding that, with minor exceptions, Customs' withholding of the requested documents was statutorily authorized.[8]  On the same day, as part of pretrial discovery in two Customs Court actions filed by Carlisle challenging the Customs Service's underlying countervailing duty determinations,[9] Customs provided Carlisle with virtually unexpurgated copies of eight of the twelve documents at issue here.[10]

On appeal Carlisle now reiterates its challenges to Customs' claims of authorized nondisclosure under Exemptions 1, 4, and 5. For reasons outlined below we vacate, under *United States v. Munsingwear, Inc.,*[11] the district court's ruling on all documents with respect to Exemption 5.  At the same time, we affirm the district court's finding that the remaining portions of four documents were immune from disclosure under Exemption 1.[12]

## I.  ANALYSIS

### A.  *Exemption 5*

The parties agree that eight of the documents in dispute have been released to appellants virtually in their entirety in the course of civil discovery in the Customs

the court order of 1 March, *see* Supplemental Affidavit of Leonard Lehman (14 March 1979), *reprinted in* App. at 95–175 [hereinafter Second Lehman Affidavit], and the second addressing the applicability of Exemption 1 to certain of the requested documents, *see* Supplemental Affidavit of Leonard Lehman (20 March 1979) [hereinafter Third Lehman Affidavit], *reprinted in* App. at 176–84.

8.  The case came before Judge Oberdorfer as part of three consolidated actions concerning a total of 21 documents.  *Carlisle Tire & Rubber Co. v. United States Customs Service*, Nos. 78–2001, 78–2002, 79–0224 (D.D.C. 21 Nov. 1979), *reprinted in* App. at 5–24.

On cross-motions for summary judgment, the court granted summary judgment for Customs in two of the actions and partial summary judgment for Customs in the third.  *Id.* The district judge eschewed *in camera* review on the grounds that "[t]he supplementary affidavits filed in the consolidated actions, together with the documents submitted with deletions for 16 of the 21 items, have permitted the Court to obtain a detailed knowledge of the type of information contained in the withheld materials. . . . [Thus] *in camera* inspection would serve no purpose." *Id.* at 3, *reprinted in* App. at 7.

The court found, with respect to eight of the documents (Documents Nos. 2–9), classed as intra-agency memoranda by or to a number of the parties, all deleted material was properly withheld pursuant to Exemption b(5).  *Id.* at 8–10, *reprinted in* App. at 12–14.  With respect to four of the documents (Documents Nos. 10–13), responses by the ROK government to Customs' questionnaires, the court further held that they had been properly classified "Confidential" pursuant to the relevant Executive Order and thus nondisclosure of those documents in their entirety was authorized under Exemption 1.  At the same time, the court granted summary judgment for Carlisle with respect to substantive excerpts from Documents Nos. 10–

13 which had previously been published in the *Federal Register. Id.* at 11–17, *reprinted in* App. at 15–21.  Finally, the court held that some portions of Documents Nos. 10–13 were also exempt from disclosure under Exemption 4.  *Id.* at 17, *reprinted in* App. at 21.

9.  On 8 January 1979 Customs issued a Final Countervailing Duty Determination in the Taiwan case, advising the public that its investigation had resulted in a final determination that Taiwan had *not* given benefits considered to be bounties or grants on the manufacture, production or exportation of bicycle tires and tubes.  44 Fed.Reg. 1815–16 (1979), *reprinted in* App. at 135–36.  Appellants sought judicial review of the unfavorable determination in the United States Customs Court.  In October 1979, Carlisle initiated discovery in the cases of *Carlisle Tire & Rubber Co. v. United States*, Customs Court No. 79–3–00423 and *Carlisle Tire & Rubber Co. v. United States*, Customs Court No. 79–5–00748.  Brief for the Appellant at 4.

10.  Appellant acknowledges that, in the course of civil discovery in the Customs Court, Customs turned over the three memoranda numbered 4, 6, and 7 "in [their] entirety" and also disclosed the five other memoranda numbered 2, 3, 5, 8, and 9 with only "a few insignificant deletions." Brief for the Appellant at 74.

11.  340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950).

12.  We therefore find it unnecessary to decide whether the district judge correctly determined that the four requested documents not disclosed during discovery were also immune from disclosure under Exemption 4, 5 U.S.C. § 552(b)(4) (1976).  *See Carlisle Tire & Rubber Co. v. United States Customs Service*, Nos. 78–2001, 78–2002, 79–0024 (D.D.C. 21 Nov. 1979) at 17, *reprinted in* App. at 21.

**214**

Court.[13] Because any case or controversy regarding these particular documents has consequently evaporated,[14] we find it unnecessary to decide now whether the district judge correctly found those documents to be intra-agency memoranda exempt from disclosure under Exemption 5.[15] "[T]o prevent a judgment, unreviewable because of mootness, from spawning any legal consequences," however, we vacate the district court's ruling with respect to those documents, as well as its ruling under Exemption 5 on the remaining four documents, and direct the district court to dismiss that part of the case.[16]

### B. *Exemption 1*

■ Under Exemption 1, an agency may withhold documents only if they apply to matters which are "(A) specifically authorized under criteria established by an Exec-

utive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order . . . ."[17] A court must conduct a *de novo* review of the agency's classification decision, with the burden on the agency to show proper classification.[18]

The four documents for which Customs claims Exemption 1 protection are responses by the ROK government to questionnaires issued to it by Customs in the course of the countervailing duty proceedings.[19] Each of these responses was transmitted to Customs together with an express ROK government request for confidential treatment.[20] Through administrative oversight, however, the documents were never formally classified pursuant to the Executive Order governing at the time that the documents were received by Treasury.[21] Carlisle asserts that the district court should

---

**13.** *See* note 10 *supra.*

Documents Nos. 4, 6, and 7 have been disclosed without deletions; Documents Nos. 2, 5, and 9 have been released in their entirety but for the last line of each giving the recommendation of the author. Document No. 3 has been wholly released except for a list of financial figures on one of its seven pages and the recommendation line; Document No. 8 has been wholly released except for some two sentences containing recommendations. Brief for Appellees at 9–10. Appellant acknowledges that it has now received these documents "virtually intact," Brief for Appellant at 16; and furthermore, that the deletions in Documents 2, 3, 5, 8 and 9 are "insignificant," Brief for the Appellant at 15, 74.

**14.** Under FOIA, federal courts have jurisdiction to order agencies to produce only those records "improperly withheld" from the plaintiff. 5 U.S.C. § 552(a)(4)(B) (1976). Thus, when an agency has not "withheld" records federal courts have no authority to order their production. *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 139, 100 S.Ct. 960, 963, 63 L.Ed.2d 267 (1980); *Forsham v. Harris,* 445 U.S. 169, 177, 100 S.Ct. 978, 983, 63 L.Ed.2d 293 (1980). "Once the records are produced the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made." *Crooker v. U. S. State Department,* 628 F.2d 9, 10, 202 U.S.App.D.C. (D.C.Cir.1980).

**15.** *See* note 8 *supra.*

**16.** *United States v. Munsingwear, Inc.,* 340 U.S. 36, 41, 71 S.Ct. 104, 107, 95 L.Ed. 36 (1950).

**17.** 5 U.S.C. § 552(b)(1) (1976).

**18.** 5 U.S.C. § 552(a)(4)(B) (1976). *See also* S.Rep.No. 1200, 93d Cong., 2d Sess. 11–12 (1974), U.S.Code Cong. & Admin.News 1974, p. 6267; *Lesar v. United States Department of Justice,* 636 F.2d 472 at 481 (D.C.Cir.1980).

**19.** Documents Nos. 10, 11, and 13 are responses to questionnaires transmitted by the government of ROK in the countervailing duty cases of leather wearing apparel, cordage and textiles. Document No. 12 is a supplemental response in the countervailing duty case of Korean handbags. Third Lehman Affidavit, ¶¶ 11–14, *reprinted in* App. at 112–19.

**20.** The ROK government letters requesting "confidential" or "in confidence" treatment for Documents Nos. 10, 11, and 13 are reproduced in the Appendix at 157, 161, and 175, respectively. Although the letter requesting similar treatment for Document No. 12 is not reproduced in the Appendix, all parties and the district court agree that such a letter was sent. *See Carlisle Tire & Rubber Co. v. United States Customs Service,* Nos. 78–2001, 78–2002, 79–0224, slip op. at 11 (D.D.C. 21 Nov. 1979), *reprinted in* App. at 15.

**21.** Exec. Order No. 11,652, 3 C.F.R. 375 (1973) (superseded as of 1 December 1978 by Exec.Order No. 12,065, 3 C.F.R. 190 (1979)). *See* First Lehman Affidavit at ¶ 15c, *reprinted in* App. at 74.

not have condoned the withholding of these four documents under Exemption 1, first because they were never properly classified to begin with according to either the procedural[22] or the substantive criteria[23] of Executive Order No. 11,652; and second, because they were subsequently *improperly* classified under both the procedural[24] and substantive[25] criteria of Executive Order No. 12,065, which superseded Executive Order No. 11,652.

In our view, only the second of these two contentions deserves more than cursory discussion here. In *Lesar v. United States Department of Justice*[26] and *Baez v. United States Department of Justice*[27] we have recently reiterated that an appellate court's role in reviewing the propriety of an agency's classification decision should proceed in two steps: first, determining which Executive Order properly governed the agency's ultimate classifications of documents in dispute,[28] and second, ensuring that those documents were in fact properly classified according to both the procedural and substantive criteria contained in that Executive Order.[29]

With regard to the first step, in *Lesar* and *Baez* we held that when a court conducts procedural and substantive review of a classification decision the relevant Executive Order is the one "in effect at the time the agency makes its ultimate classification determination."[30] By this test, Executive Order No. 12,065 governs the classification here; since that Executive Order expressly provides for classification at times later than that of the origin of the document,[31] proper subsequent classification under Executive Order No. 12,065 suffices to cure any procedural and substantive defects in classification which may have existed under Executive Order No. 11,652.[32] The second step of our review is simplified as well by Carlisle's acknowledgment that the four documents it seeks are currently properly classified according to the *procedural* criteria of Executive Order No. 12,065.[33] Thus the only issue properly remaining on review is whether the district judge correctly concluded that the contested documents had been properly classified "Confidential" as "foreign government information" under the *substantive* criteria found in Executive Order No. 12,065.[34]

■ Executive Order 12,065 provides generally for classification as "Confidential" of information "the unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security."[35] Information may not be considered for classification unless it concerns one of seven categories, of which "foreign government information" is one.[36]

22. Brief for the Appellant at 55–56.

23. *Id.* at 56–57.

24. *Id.* at 57–58.

25. *Id.* at 58–67.

26. 636 F.2d 472 (D.C.Cir.1980) [hereinafter *Lesar*].

27. 647 F.2d 1328 (D.C.Cir.1980) [hereinafter *Baez*].

28. *Lesar* at 479–81; *Baez* at 1333–34.

29. *Lesar* at 481–85; *Baez* at 1334–37.

30. *Baez* at 1334. *See also Lesar* at 480–81.

31. Exec. Order No. 12,065, § 1–606, 3 C.F.R. 190, 194–95 (1979). *See also Baez* at 1334.

32. *Id.*

33. Brief for Appellant at 58 ("As finally classified under E.O. 12065 in late March 1979, the Agency appears to have substantially complied with [the necessary] marking requirements."). *See also* Third Lehman Affidavit at ¶¶ 4–7, *reprinted in* App. at 177–84.

34. *Carlisle Tire & Rubber Co. v. United States Customs Service*, Nos. 78–2001, 78–2002, 79–0224, slip op. at 15–17, *reprinted in* App. at 19–21.

35. Exec. Order No. 12,065, § 1–104, 3 C.F.R. 190, 191 (1979).

36. The seven categories found in *id.*, § 1–301, 3 C.F.R. 190, 193 (1979) are:
    (a) military plans, weapons, or operations;
    (b) foreign government information;
    (c) intelligence activities, sources or methods;
    (d) foreign relations or foreign activities of the United States;

Furthermore, the Executive Order goes on to provide that "[e]ven though information is determined to concern one or more of the [seven categories] in Section 1–303, it may not be classified unless an original classification authority also determines that its unauthorized disclosure reasonably could be expected to cause at least identifiable damage to the national security." [37] Thus, to show proper classification the agency must satisfy the reviewing court of two matters: that "the information fits within one of the seven enumerated categories and [that] unauthorized disclosure of the material reasonably could be expected to cause the requisite potential harm." [38]

We have held repeatedly in recent years that the agency may carry this burden

> through the submission of affidavits that describe with reasonably specific detail the nature of the documents at issue and the justification for nondisclosure. The courts must accord "substantial weight" to these affidavits. That is, if the description in the affidavits demonstrates that the information logically falls within the claimed exemption and if the information is neither controverted by contrary evidence in the record nor by evidence of agency bad faith, then summary judgment for the Government is warranted. The court need not review the documents *in camera* unless the affidavits are inadequate for a reasoned *de novo* determination.[39]

Customs has sought to bear its burden here primarily through submission of the three affidavits sworn by its Assistant Commissioner in charge of Regulations and Rulings.[40] The third of these asserts that the documents sought fell into the category of "foreign government information" because they embrace "information that has been provided to the United States in confidence by . . . a foreign government." [41] The affidavits further aver that, given the express foreign government requests for confidentiality, classification of this foreign government information as "Confidential" is compelled by section 1–505 of the Executive Order:

> Foreign government information shall either retain its original classification designation or be assigned a United States classification designation that shall ensure a degree of protection equivalent to that required by the entity that furnished the information.[42]

With regard to the showing of reasonable likelihood of harm to national security from unauthorized disclosure, Customs begins by citing section 1–303 of the Executive Order, which expressly creates the presumption that "[u]nauthorized disclosure of foreign government information . . . [will] cause at least identifiable damage to the national security," [43] thus suggesting that, in the absence of evidence to the contrary, prima facie foreign government information is presumed worthy of at least "Confidential" treatment. Customs' affidavits then sup-

---

(e) scientific, technological, or economic matters relating to the national security;
(f) United States Government programs for safeguarding nuclear materials or facilities; or
(g) other categories of information which are related to national security and which require protection against unauthorized disclosure as determined by the President pursuant to Section 1–201, or by an agency head.

**37.** *Id.,* § 1–302.

**38.** *Baez* at 1334. *See also Lesar* at 481; *Hayden v. National Security Agency/Central Security Serv.,* 608 F.2d 1381, 1387 (D.C.Cir. 1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

**39.** *Baez* at 1335 (citations omitted). *See also Lesar* at 481; *Hayden v. National Security Agency/Central Security Serv.,* 608 F.2d 1381, 1386–87 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Ray v. Turner,* 587 F.2d 1187, 1194–95 (D.C.Cir. 1978); *Weissman v. CIA,* 565 F.2d 692, 697 (D.C.Cir.1977).

**40.** *See* notes 6–7 *supra.*

**41.** Third Lehman Afidavit at ¶¶ 4b, 5b, 6b & 7b, *reprinted in* App. at 177–78, 179, 180–81, 182–83, *citing* Exec. Order No. 12,065, § 6–103, 3 C.F.R. 190, 204 (1979).

**42.** *Id.,* § 1–505, 3 C.F.R. 190, 194 (1979).

**43.** *Id.,* § 1–303, 3 C.F.R. 190, 193 (1979).

port that presumption with the contention that the disclosure of these documents would impair the ability of the Customs Service and the Treasury to obtain similar information from foreign governments in the future.[44] To the extent that unauthorized disclosure of these documents would contravene guarantees of confidentiality made to a foreign government, the affidavits suggest, their revelation would likely damage the foreign relations of the United States, and hence the national security.[45]

Judge Oberdorfer found that because the "documents in question were plainly submitted by the governments of Taiwan and the ROK in response to questionnaires directed to them by the Customs Service [and because the] foreign governments explicitly requested that the responses be accorded confidential treatment" Customs had caried its burden of showing that the documents constituted foreign government information properly classified as "confidential."[46] On appeal Carlisle challenges this finding in two ways. First, it argues that section 1–505 does not "mandate that foreign government information actually be assigned a classification designation in all cases."[47] Second, it contends that the presumption of "identifiable damage to national security," raised by section 1–303 of the Executive Order, is nullified by Treasury Regulation § 2.5(c), which states "[t]he fact that the information concerns one or more of the criteria for classification of Section 1–301 of the Order does *not* create a presumption that the information meets the damage tests of Sections 1–302 and 1–303.-"[48] Appellant reads this regulation not only as "[r]eflecting the rebuttable nature of the presumption of identifiable damage articulated in section 1–303," but also as a

factor which "negatives the operation of the presumption and requires classifiers to determine affirmatively whether or not foreign government information can lawfully be protected from disclosure under E.O. 12065."[49]

With respect to Carlisle's first contention, we agree that the fact that certain information has been received from a foreign government "in confidence" does not, by itself, compel automatic classification of the document. Section 1–302 makes clear that, even for foreign government documents, a classification decision requires an additional determination by the original classification authority that unauthorized disclosure reasonably could be expected to cause "at least identifiable damage" to the national security.[50] Although section 1–505 of the Executive Order employs language indicating that all foreign government information "shall" be protected,[51] because the general section of the Executive Order under which it falls concerns itself primarily with procedures for identification and marking of the documents, it is possible to read section 1–505 as intended primarily to guide the initial marking and identification of foreign classified documents rather than the classification decision itself.

■ We cannot agree, however, with Carlisle's second contention—namely that Treasury Regulation § 2.5(c) effectively requires that the documents here should *not* have been classified "Confidential," because their disclosure could not have validly been presumed to damage the national security. While we cannot deny the contradiction between the plain language of the Executive Order and the language found in the Treasury regulation, neither can we accept ap-

---

44. *See* Third Lehman Affidavit at ¶¶ 4d, 5d, 6d, 7d, *reprinted in* App. at 178, 180, 181–82, .183–84.

45. Executive Order No. 12,065's definition of "national security" includes the "foreign relations of the United States." Exec. Order No. 12,065, § 6–104, 3 C.F.R. 190, 204 (1979).

46. *Carlisle Tire & Rubber Co. v. United States Customs Service*, Nos. 78–2001, 78–2002, 79–

0224, slip op. at 14 (D.D.C. 21 Nov. 1979), *reprinted in* App. at 18.

47. Brief for the Appellant at 60.

48. 31 C.F.R. § 2.5(c) (1980) (emphasis added).

49. Brief for the Appellant at 60; *id.* at 62.

50. *See* pp. 215–216 *supra*.

51. *See* p. 216 *supra*.

pellant's notion that a regulation of a cabinet department can serve to override a direct Executive Order of the President. Were we to read the regulation as controlling we would permit the will of the Secretary of the Treasury to dominate the will of our Chief Executive.

Furthermore, even if we were to treat the contrary Treasury regulation as evidence rebutting the presumption of identifiable damage to national security found in section 1–303 of the Executive Order, the bare existence of that regulation does not seem to us sufficient evidence to drive the presumption from this case. We need not find that the President intended that unauthorized disclosure of foreign government information should be *irrebuttably* presumed to damage the nation's security[52] to recognize that the section 1–303 presumption is a powerful one. As Judge Oberdorfer noted, this presumption—that disclosure of information given to our government by foreign governments, accompanied by express requests for confidentiality, will damage national security—is "unique among all categories of information subject to classification."[53] The specific directive that material furnished our agencies be afforded protection here equivalent to that afforded it by the furnishing government has been repeated in two successive Executive Orders.[54] The presumption of identifiable damage was specially added in 1978 to No. 12,065 despite President Carter's clear intent otherwise generally to *tighten* the standards of classification.[55] Section 2.7(*1*) of the Treasury Regulations[56] lends further support to the notion that bona fide foreign government information should be presumed classified unless substantial evidence to the contrary is presented.

We need not decide here when, if ever, a FOIA requester can overcome the presumption that disclosure of evidence provided to our government agencies by foreign sovereigns under express requests of confidentiality will damage our national security. Suffice it to say that Carlisle has not produced sufficient prima facie evidence of *non* damage here to overcome that presumption in this case. On appeal Carlisle has made only two general arguments in this regard: that Customs' failure to classify the information in these documents from the outset, "demonstrate[d] that the Agency did not, in fact, consider the information in the subject

52. *Cf.* Brief for the Appellant at 61.

53. *Carlisle Tire & Rubber Co. v. United States Customs Service*, Nos. 78–2001, 78–2002, 79–0224, slip op. at 15 (D.D.C. 21 Nov. 1979), *reprinted in* App. at 19.

54. In addition to section 1–505 of the current Executive Order, section 4(C) of its predecessor, Executive Order No. 11,652, 3 C.F.R. 375, 379–80 (1973), states in its "Classification" section:

Classified information or material furnished to the United States by a foreign government or international organization shall either retain its original classification or be assigned a United States classification. In either case, the classification shall assure a degree of protection equivalent to that required by the government or international organization which furnished the information or material.

55. *See* 14 Weekly Comp. of Pres. Doc. 1193–94 (29 June 1978).

56. The regulation, governing marking of foreign government information, states:

Except in those cases where such markings would reveal intelligence information, foreign government information incorporated in United States documents shall, whenever practicable, be identified in such manner as to ensure that the foreign government information is not declassified prematurely or made accessible to nationals of a third country without consent of the originator. Documents classified by a foreign government or an international organization of governments shall, if the foreign classification is not in English, be marked with the equivalent or appropriate U.S. classification. Foreign government information not classified by a foreign government or an international organization of governments, but provided to the United States in confidence by a foreign government or by an international organization of governments shall be classified at an appropriate level and shall be marked with the U.S. classification accordingly.
31 C.F.R. § 2.7(*1*) (1980).

*See also* Section I.G. 12 of the Implementing Directive of the Interagency Classification Review Committee, 43 Fed.Reg. 46,280, 46,281 (1978) (employing the same language in implementing Executive Order No. 12,065).

documents to be important to the security of the Nation," [57] and that because some portions of the information sought were published in the *Federal Register* and one of the contested documents was inadvertently made public, Customs' claim of "serious adverse consequences" from disclosure of the documents had no force.[58]

In his memorandum and order, however, the district judge addressed these concerns in two ways. First, he distinguished the type of "classified" information which in fact has been deliberately disclosed to large numbers of individuals [59] from the type of "inadvertent and limited disclosure" which occurred here.[60] Second, he granted summary judgment for Customs only with respect to those portions of the requested documents which had not previously been excerpted in *Federal Register* notices and granted summary judgment for Carlisle with respect to documents already in the public domain, affording the plaintiff leave to "move for further relief, including *in camera* inspection," should the defendants fail to comply.[61]

To summarize, we agree that the affidavits provided by the agency "indicate a logical nexus between the information at issue and the claimed exemption," thus satisfying the test for Exemption 1 purposes which we have recently clarified in *Lesar* and *Baez*.[62] The information sought clearly fits into the category of foreign government information; the presumption of damage from disclosure was not overcome. Furthermore, we think that the affidavits depict with reasonably specific detail the nature of the documents at issue and the potential harm which could be expected to occur from their release.[63]

## II. CONCLUSION

For the reasons developed above, we hold the district court judgment vacated in part and otherwise

*Affirmed.*

---

57. Brief for the Appellant at 66.

58. *Id.*

59. *See, e. g., Halperin v. Department of State,* 565 F.2d 699 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1046, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978) (release of verbatim transcript of background press conference attended by 32 reporters without security clearances).

60. *Carlisle Tire & Rubber Co. v. United States Customs Service,* Nos. 78–2001, 78–2002, 79–0224, slip op. at 16 (D.D.C. 21 Nov. 1979), *reprinted in* App. at 20. According to Carlisle, one of the documents sought here, Document No. 13, was freely available for inspection in the Reading Room of the Customs Service Headquarters as late as the fall of 1978. *Id.* at 12, *reprinted in* App. at 16.

61. *Id.* at 17, *reprinted in* App. at 21.

62. *Baez* at 1336; *Lesar* at 481. Because we find the documents exempt from disclosure under 5 U.S.C. § 552(b)(1), we need not examine

here whether the affidavits were also sufficient to secure their exemption under 5 U.S.C. § 552(b)(4).

63. Carlisle argues, not unconvincingly, that foreign companies should not be able to convert their ordinary business information, for which they may request business confidential treatment under Exemption 4, into information entitled to national security confidential treatment under Exemption 1 merely by channeling that information through a foreign government. Brief for the Appellant at 65. We cannot deny the possibility that cases may arise in which this is a legitimate concern. Carlisle did not present to the trial court, however, nor does it present to us on appeal, any prima facie proof that such subterfuge has taken place here. In the absence of such evidence, we cannot find that the district judge erred in granting summary judgment for Customs on Exemption 1 grounds.