**Jack H. TAYLOR, Jr., et al.,
Plaintiffs-Appellees,**

v.

**DEPARTMENT OF THE ARMY,
Defendant-Appellant.**

**No. 81–2280.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 11, 1982.
Decided July 30, 1982.

---

Howard S. Scher, Atty., Dept. of Justice, with whom Charles F. C. Ruff, U. S. Atty., Leonard Schaitman and Freddi Lipstein, Attys., Dept. of Justice, Washington, D. C., were on the brief for defendant-appellant.

George R. Clark and James K. Jackson, Washington, D. C., were on the brief for plaintiffs-appellees.

Before MacKINNON and MIKVA, Circuit Judges, and COWEN, Senior Judge.*

Opinion for the court filed by Senior Judge COWEN.

COWEN, Senior Judge:

Jack H. Taylor, a reporter for *The Daily Oklahoman,* and the newspaper's publisher, the Oklahoma Publishing Company, brought suit in the United States District Court for the District of Columbia under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976), seeking the disclosure of certain documents by the United States Army. The Army appeals the order of the District Court requiring production of the documents. For the reasons to be set forth, the decision of the District Court is reversed and the case remanded.

I. THE FACTS AND PRIOR PROCEEDINGS

A. On July 17, 1980, Jack H. Taylor submitted a Freedom of Information Act request to the U.S. Army seeking measured resource area ratings (MRAR's) of 168 battalions and separate commands which comprise all of the major combat units of the Army. MRAR's are parts of operational readiness or "unit status reports" which Army Regulation (AR) 220-1 ¶ 2-2 (1978) requires various Army units to submit. The unit status reports are designed to assist in the allocation of Army resources and the assessment of total force readiness. AR 220-1 ¶ 1-5(c). Each unit status report consists of four numerical measured re-

source area ratings, categories of data pertaining to each measured resource area, coded reasons why each area did not receive a rating of "1" (the highest rating), the unit's overall rating, and subjective comments of the unit's commander. The four measured resource areas are: personnel, equipment readiness, training, and equipment on hand. In his FOIA request and in this lawsuit, Mr. Taylor seeks only the numerical ratings for the four measured resource areas.

B. By letter dated August 19, 1980, the Army denied Mr. Taylor's request on the grounds that the information requested "represents a compilation of data which is classified or warrants the classification of CONFIDENTIAL," and was exempt from disclosure pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(1) (1976). Release of this data, the Army stated, could reasonably be expected to cause identifiable damage to the national security and foreign relations of the United States "in that it reveals operational readiness of our combat forces in the United States and overseas."

The General Counsel, Department of the Army, denied Mr. Taylor's appeal on August 26, 1980, noting that:

> [T]he sensitive nature of measured resource area ratings and the number of ratings requested combine to justify classification of this information as concerning "military plans, weapons, or operations" the release of which "reasonably could be expected to cause at least identifiable damage to the national security." DOD Directive 5200.1-R, ¶ 2-202(a), E.O. 12065, § 1-301(a).

C. Thereafter, Mr. Taylor and the Oklahoma Publishing Company filed this action in the District Court,[1] wherein the Army submitted the affidavits of three high-ranking military officers in support of its position that the requested material is currently

---

\* Of the United States Court of Claims, sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Mr. Taylor presently has pending three other suits against the Air Force, the Navy and the National Guard in which he has sought similar military information. They are: *Taylor, et al.*

*v. Dept. of the Air Force, et al.,* Civ. No. 80–2846 (D.D.C.); *Taylor, et al. v. Dept. of the Navy, et al.,* Civ. No. 80–2845 (D.D.C.), and *Taylor, et al. v. National Guard and Army,* Civ. No. 80–2844 (D.D.C.). Appellant's Brief at p. 6.

classified and exempt from disclosure under Exemption 1.[2]

The first affidavit was made by General James E. Moore, Jr., who has operational responsibility for "analyzing, distributing and safeguarding information contained in unit status reports dealing with operational readiness of Army forces."

The second affidavit was executed by General Edmund R. Thompson, the highest ranking military intelligence officer in the Army, who has "cognizance of United States intelligence objectives, policies, and activities worldwide" and is "Chairman of the Department of the Army's Information Security Committee. He has the responsibility to review and process appeals of requests for records under 5 U.S.C. 552 when the initial denial is based on the fact that the document is classified."

The third affidavit was by General William R. Richardson, who is responsible for "strategy formulation, overall force development, individual and unit training policy, and establishment of requirements and priorities for, and employment of, Army units." He is also the "principle [sic] advisor of the Army Chief of Staff on joint matters, National Security Counsel [sic] matters, and the politico-military aspects of international affairs."

Mr. Taylor also submitted an affidavit which was referred to and relied upon by the court.

The case was decided on cross-motions for summary judgment, and on November 20, 1981, the District Court issued its opinion and order which required disclosure of the requested documents. First, the court held that the language of the Army's regulation (AR 220-1 ¶ 2-7) unequivocally stated that single units of the MRAR's are unclassified, and that the court's inquiry could end with that determination. In so holding, the court rejected the Army's interpretation of the regulation.

Secondly, the court ruled that even if the Army were correct in its contention that the regulation referred to the underlying raw data and not the ratings, it was "improper substantively to classify the measured resource ratings under Executive Order 12,065."

The District Court also rejected the Army's contention that even if the MRAR's for one or two units are not classified, their compilation is classified and may be withheld.

Pursuant to its opinion, the District Court issued an injunction which ordered release of the requested material in 10 days, and thereafter denied the Army's motion for a stay pending an appeal.

D. On December 7, 1981, this court granted the Army's emergency application for a stay. Also, on December 30, 1981, this court denied Mr. Taylor's motion to vacate the stay on the ground that the court is without jurisdiction to issue the stay.

## II. ANALYSIS

### A. *Army Regulations Governing Classification*

Army Regulation 220-1 ¶ 2-7 (1978), in effect at the time of Mr. Taylor's FOIA request, provided:

2.7. *Classification of reports.* The originator is responsible for ensuring that the appropriate Defense security classification is assigned to each report. Overclassification and unnecessary classification will be scrupulously avoided; however, each card of a report will be classified equal to the highest classification contained in the report. As a minimum each unit status report will be classified CONFIDENTIAL. *Ratings for measured resource areas of a single unit are unclassified.* The overall rating for a single unit

---

**2.** Exemption 1, 5 U.S.C. § 552(b)(1) (1976), provides:

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order * * *.

will be considered at least CONFIDENTIAL. Unit status reports may be declassified after one year if no other classified data is contained which would preclude this declassification schedule. The advanced declassification schedule marking (para 4–401, DOD 5200.1–R) may be used with this regulation cited as the "Classified by" authority. [Emphasis added]

As previously stated, the Army's interpretation of the italicized sentence in AR 220–1 ¶ 2–7, is that this sentence refers to the "raw data" from which the MRAR's were obtained, rather than the ratings themselves; the Army asserted that this construction of the regulation had been consistently followed. The District Court rejected this interpretation and correctly noted that the regulation explicitly stated that the ratings of a single unit are unclassified.

As stated *supra*, the Army also argued that even if the measured resource area ratings of one or two Army units are properly unclassified, their compilation is classified and may be withheld. Another regulation, AR 380–5 ¶ 2–211 (1979), permits the classification of a compilation of unclassified information in unusual circumstances. That regulation states:

2–211 *Compilation of Information*

A compilation of unclassified items of information shall normally not be classified. In unusual circumstances, classification may be required if the combination of unclassified items of information provides an added factor which warrants classification under paragraph 2–202. Classification on this basis shall be used sparingly and shall be fully supported by a written explanation which will be provided with the material so classified. (see also paragraphs 2–204 and 4–203.) Compiled information may carry a classification if authorized in classification guides or other source documents or if approved by an appropriate original classification authority. A written explanation and reason for classification are required.

Although the District Court rejected the Army's claim that the MRAR's were classified as a compilation, we think the record clearly demonstrates that the requested compilation of information does provide an "added factor" of sensitivity that warrants classification under the regulation. As is stated in the affidavit of Brigadier General James E. Moore, Jr., Deputy Director, Operations and Plans, Headquarters, Department of the Army:

While an individual unit's resource area ratings appear to be routine information, they are critically important. Given the four resource area ratings of a subordinate unit, one can determine the overall rating of that subordinate unit. Once the overall rating for each subordinate unit is known, one can determine the status or combat potential of an entire division. Therefore, given the four resource area ratings of each battalion of each division or equivalent major unit, one could determine the combat potential of the entire Army forces available to defend the United States.

The District Court's ruling also conflicts with General Thompson's affidavit, wherein he stated:

While a single evaluation of one particular aspect of a battalion's combat readiness posture may not contain sensitive information, the complete evaluation of that battalion and all other battalions in a division is clearly classified information.

The above statements are supported by AR 220–1 ¶ 3–15 and its referenced table and figure. This regulation sets forth the mathematical formula whereby the MRAR's of individual units are compiled to produce the MRAR's for entire divisions, brigades and regiments. Armed with this regulation, anyone in the possession of all the MRAR's for individual "single units" would be able to determine the relative strengths of the major units of the entire United States Army.

In a situation where there was no similar regulation, it was recently held that a compilation of unclassified information, mixed with some classified material, may be fully

exempt from disclosure under Exemption 1. *Halperin v. National Security Council,* 452 F.Supp. 47 (D.D.C.1978), *aff'd without opinion,* 198 U.S.App.D.C. 91, 612 F.2d 586 (1979). In that case, the National Security Council (NSC) submitted affidavits in support of its contention that the release of unclassified material on NSC lists *en masse* could reasonably be expected to damage national security. The agency conceded that damage to the national security could not reasonably be expected if only a small number of individual titles were released, but based the claim of exemption on the total effect of all of the unclassified titles rather than the sensitivity of any one or more of them individually. The District Court agreed with this contention and declared that there was no reasonable way for it "to slice the list thin enough to eliminate the national security hazard and still leave a 'list' as such for production." 452 F.Supp. at 52. Declining to examine the material *in camera,* the court held that the requested material in its totality was exempt from disclosure.

Here, the District Court distinguished *Halperin* on the ground that it was not persuaded that the compilation of material requested by Mr. Taylor provided the "added factor" justifying classification. This conclusion is in conflict with our interpretation of the affidavits of General Moore and General Thompson quoted above.

■ Since it is beyond dispute that the determinations described by General Moore can be drawn from the documents requested by Mr. Taylor, the only question remaining is whether that fact did constitute an "added factor." The Army, construing its own regulation, found that it did. The deference to be accorded such a determination is even greater than that owed an agency's interpretation of a statute it is charged to administer. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Hence, we find that the requisite "added factor" was present here.

Pertinent here is the observation which this court made in *Halperin v. Central Intelligence Agency,* 203 U.S.App.D.C. 110, 629 F.2d 144, 150 (1980):

> We must take into account, however, that each individual piece of intelligence information, much like a piece of a jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself.

In rejecting the compilation argument, the District Court also declared that the logic of the Army's position was questionable because requesters could avoid the compilation problem simply by having different individuals submit FOIA requests one-by-one for the ratings of the different units. As already indicated, the court in *Halperin v. National Security Council* rejected a similar argument, in spite of the fact that the agency there had conceded that there would be no damage to national security if only a small number of the requested items were released. Moreover, General Richardson, in his affidavit, stated:

> I am also confident that if an individual or a group of people had ever attempted to obtain a complete inventory of the Army's resource area ratings one by one, their attempt would have been uncovered at a very early stage. Because of the sensitivity of the resource area ratings, any request would have caused the person processing the request to contact personnel in my office at Headquarters, Department of the Army, who in turn would have advised that the information could not be released. Furthermore, within a week of Headquarters, Department of the Army being notified of Mr. Taylor's request, the process was set in motion to close any possible ambiguity or loophole that Mr. Taylor may have identified in Army Regulation 220–1. Paragraph 2–7 of AR 220–1 now unequivocally states that all measured resource area rating[s] will be classified at least confidential for a period of six years. The reason such a change was never made previously is because the Army never believed that the

governing paragraph made the resource area ratings unclassified.

Accordingly, on the basis of the Army affidavits we find that the compilation of the material requested by Mr. Taylor is properly classified under AR 380–5 ¶ 2–211. In view of this conclusion, we find that it is not necessary to decide whether the total amount of material requested by Mr. Taylor is classified under Army Regulation 220–1 ¶ 2–7 (1978).

B. *Exemption 1—Procedural and Substantive Compliance with the Executive Order*

█ The District Court held that even if the MRAR's were classified under Army regulations, they did not fall within Exemption 1 because the classification of the information was not in compliance with Executive Order 12,065, which governs the classification of the information. Thus, even though we find that it was proper to classify the MRAR's Mr. Taylor sought as a "compilation" under AR 380–5 ¶ 2–211 (1979), it remains to be determined whether the information was classifiable and was in fact classified under the executive order as required by Exemption 1. Classification of the MRAR's will bar disclosure under that exemption only if both the substantive and procedural requirements of the Executive Order have been met. *See Carlisle Tire & Rubber Co. v. United States Customs Service,* 663 F.2d 210 (D.C.Cir.1980).

1. *Procedural Compliance*

General Moore stated in his affidavit that he had classified the compiled information as follows:

The information requested was found in two CONFIDENTIAL computerized reports consisting of 22 and 30 pages respectively. These computerized reports *were classified* by my office on July 10, 1980 [seven days prior to Taylor's request] marked confidential at the top and bottom of each page, and scheduled for declassification or review on December 31, 1986. The reports contain data from hundreds of unit status reports printed in

column format by unit for clarity, easy reference, and economy. The information responsive to plaintiff Taylor's request are four columns of numbers under the headings PER, ER, EOH, and TNG representing the four resource areas. [Emphasis added]

In his affidavit, General Thompson stated that he is an "original classification authority" and "Chairman of the Department of the Army Information Security Committee (DAISC)" to which Mr. Taylor's appeal from the denial of his request was referred. In his affidavit, General Thompson further declared as follows:

b. The documents responsive to Mr. Taylor's request were referred to the Committee [Department of the Army Information Security Committee (DAISC)] by the Office of the Deputy Chief of Staff for Operations and Plans and consisted of two classified documents, 22 and 30 pages respectively, representing a consolidation of hundreds of unit status reports, machine printed in a column format by unit for clarity, easy reference and economy.

\*　　\*　　\*　　\*　　\*　　\*

Subsequently, and in accordance with applicable procedures of Chapter 13, DOD Directive 5200.1–R, the Committee evaluated the documents and concluded that they were properly classified initially and that continued classification was essential. It was determined that the documents were composed entirely of classified information, as defined in Section 6–102, Executive Order 12065 and, as such, required continued protection in accordance with Section 1–402, Executive Order 12065.

d. The information contained therein was properly classified CONFIDENTIAL in accordance with Sections 1–104 and 1–301(a), Executive Order 12065, and paragraphs 2–202a and 1–503, DOD 5200.1–R, because it concerns "military plans, weapons, or operations" the "unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security."

 General Thompson's statement supports the conclusion that the Army complied with the relevant procedural requirements of Executive Order 12,065. *See id.* §§ 1–104 (Confidential Classification), 1–203, 1–204 (classification authority), 1–301(a) (Military plans, weapons or operations), and 6–102 (definitions).

Notwithstanding the Army's compliance with the terms of the Executive Order, appellees argue that the Army's classification of the compiled MRAR's did not comply with its own regulations. Paragraph 4–203 of AR 380–5 provides:

Where classification is required to protect a compilation of information under paragraph 2–211, the overall classification assigned to such documents shall be placed conspicuously at the top and bottom of each page and on the outside of the front and back covers, if any, and an explanation of the basis for the assigned classification shall be included on the document or in its text.

Appellees urge that there is no evidence that the Army included the requisite "explanation of the basis for the assigned classification" on or in the two reports containing the MRAR's.

Although direct evidence of such an explanation is lacking here, we do not believe in this instance that further proceedings are necessary to resolve the question. General Moore's and General Thompson's descriptions of the contents of the two reports with respect to the MRAR's establish that the information was in the form of a *compilation* of the MRAR's of all the units reporting.

 If in fact the explanation for the assigned classification was not included on the documents, Mr. Taylor was in no way prejudiced by the omission. As stated above, he was informed by letter of August 19, 1980, that the requested material represented a compilation of data which was classified as confidential and he was given an explanation for the classification. Assuming that the MRAR's of a "single unit"

were unclassified by the terms of AR 220–1 ¶ 2–7, it is an inescapable conclusion that the documents were properly classified as a compilation in full compliance with the requirements of Executive Order 12,065. It has been established by the Army affidavits that the release of the material could reasonably be expected to cause identifiable damage to the national security and foreign relations of the United States. Under all the circumstances, if there was a procedural violation with respect to the explanation it was not a violation of sufficient significance to affect the result in this case. Therefore, we hold here, as this court held under quite similar circumstances, that the affidavits provided the court—

with sufficient means to ascertain that the requisite harm could occur if the materials were disclosed. A remand to the district court thus would be a useless exercise.

*Lesar v. United States Dept. of Justice,* 636 F.2d 472, 485 (D.C.Cir.1980).

2. *The Substantive Requirements of Executive Order 12,065* [3] *and the Army Affidavits*

In order for documents or information to be considered for classification, Executive Order 12,065 requires that:

(1) The information involved be concerned with "military plans, weapons, or operations"; and

(2) An "original classification authority also determines that its unauthorized disclosure reasonably could be expected to cause at least identifiable damage to the national security."

Exec.Order 12,065, §§ 1–301(a), 1–302, 3 C.F.R. 190, 193 (1979).

 The burden is on the agency at the trial level to show that the information is properly classifiable in accordance with the substantive requirements of the applicable Executive Order. *Carlisle,* 663 F.2d at 214. The trial court must afford the agency the opportunity to meet this burden by submitting affidavits "that describe with reasonably specific detail the nature of the

---

**3.** Pertinent portions of Executive Order 12,065 are set forth in the appendix.

documents at issue and the justification for nondisclosure." *Baez v. United States Department of Justice*, 647 F.2d 1328, 1335 (D.C.Cir.1980). The court must give "substantial weight" to these affidavits:

> If the affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents. * * * Unless the affidavits are deficient in one of the above ways, the court need inquire no further into their veracity. [fn. omitted]

*Hayden v. National Security Agency/Central Security Service*, 197 U.S.App.D.C. 224, 608 F.2d 1381, 1387 (1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

The District Court found the Army affidavits unconvincing on the following grounds:

1. The affidavits emphasize unit status reports, not MRAR's, which are readily segregable from the reports in which they are contained;

2. MRAR's have been unclassified for 20 years;

3. As shown in his affidavit, Mr. Taylor was able to acquire copies of the ratings simply by informally contacting various Army installations;

4. Since at least 25 factors must be weighed in determining the MRAR for each of the four areas, "the numerical ratings themselves communicate very little information";

5. The extent to which the ratings reveal military capability is questionable, in view of remarks made in a speech by former Secretary of Defense Brown that the ratings are "not exactly applicable in a wartime setting"; and

6. Political reasons may have motivated the Army to withhold the information.

No showing of agency bad faith has been made, but the specificity of the affidavits and any contradictions in the record must be examined to determine whether the District Court was correct in concluding that the MRAR's were not properly classified according to the substantive criteria of Executive Order 12,065.

■ The District Court correctly noted that the Army affidavits emphasize unit status reports more than the MRAR's. However, we find that the affidavits contain sufficient specific information regarding the MRAR's to meet the standards laid down in *Hayden* and to place the requested documents within the category of FOIA Exemption 1.

The affidavit of General Moore states: [T]he resource areas are critical for determining the overall evaluation of the unit's status, or potential combat effectiveness. The resource areas referred to are personnel, equipment on hand, equipment readiness and training. Although all ratings are indicators of unit capability, the personnel and equipment ratings are primarily based on objective assessments, while the training and overall ratings are more judgmental in nature (para 1–6a, AR 220–1). Based on the resource area ratings, each commander determines an overall rating which best describes the unit's ability to accomplish the mission for which organized. Typically, the overall rating is the same as the lowest of the four measured resource area ratings.

As shown by that part of his affidavit quoted in Section A, *supra*, he stated that with the four resource area ratings of each battalion of each division—information that would have been available to Mr. Taylor if his request had been granted—one could determine the combat potential of the entire Army. His affidavit further stated that:

> This information is clearly within even the narrowest interpretation of "military plans, weapons or operations" and therefore we concluded it fell within a classifiable category as set forth in the Executive Order 12065. Furthermore, given the nature and purposes for which the requested information is used, we con-

cluded that no segregable portions of the resource ratings were unclassified and therefore releaseable. [sic]

\* \* \* \* \* \*

[W]ith the four measured resource area ratings for the requested units, a potential adversary could compile an order of battle on our entire force, indicating the capabilities and specific vulnerabilities of each unit.

The affidavit also provides a detailed description of the information contained in the MRAR's so as to place them within the "military plans, weapons, and operations" category of Executive Order 12,065.

The affidavit of General Thompson states that "identifiable damage to national security" would result in the disclosure of the requested information and that such disclosure "would provide an inimical nation with insight into the combat readiness posture and war potential of the U.S. and would weaken the ability, through exposure of our vulnerabilities, of the U.S. to successfully defend itself."

In his affidavit, which is also quoted in part in Section A above, General Thompson stated that with the information requested by Mr. Taylor, one could make an evaluation of each division and thus determine the combat potential of the entire Army forces available to defend the United States. Concluding that such information was clearly classified, he added that:

> Further it makes no difference whether the unit status reports, including their measured resource areas, are requested separately, unit-by-unit, or collectively as they were in this case. Whenever the request reaches the point that it asks for assembled information that would reveal overall unit readiness data, it must be classified. See paragraph 2–211, DOD 5200.1–R.

Finally, General Richardson's affidavit stated:

The fact that release of the entire unit status report would cause more severe damage to the national security than the release of the measured resource area ratings does not mean that the release of the resource area ratings themselves would not cause at least identifiable damage to the national security. While the release of the resource area ratings would not disclose the specific reason why a rating was not a 1, it would provide a potential adversary keen insights into Army-wide vulnerabilities. For example, through unclassified and readily available sources, the Soviet Union presumably knows how many weapons of each variety are maintained in a typical Chaperal/Vulcan section of an Air Defense battalion. By also providing the Soviets the equipment on hand and the equipment readiness resource area rating for each of the Army's Air Defense battalions, the Soviets could not only determine whether or not there exists an Army-wide vulnerability capable of exploitation, but with their knowledge of each unit's geographical location, they could also identify more specific Air Defense vulnerabilities. Through the intelligence the Soviets have gathered and their ability to synthesize and analyze what they have collected, it is disturbing how accurately they would be able to determine both the number of Air Defense weapons available to each Army division and their readiness. This same type of analysis is true regardless of the kind of unit, whether it be Air Defense or Combat Electronic Warfare, Field Artillery, Mechanized Infantry, Armored Tank, and so on.[4]

 We think that the factors noted by the District Court in support of its conclusion that the MRAR's should be disclosed do not detract from the weight of the Army affidavits. The fact that Army regulations dating back to April 1964, stated that "ratings for measured resource areas of a single unit are unclassified," does not establish that this information was ever in fact re-

---

**4.** In fairness to the District Court, it should be pointed out that General Richardson's affidavit was first filed in a motion for reconsideration, after the District Court had granted summary judgment for Mr. Taylor.

leased to the public. Moreover, the regulations cannot override the Executive Order, which is controlling. *Carlisle*, 663 F.2d at 218.

The court's statement that Mr. Taylor was able to acquire copies of the ratings simply by contacting various Army installations is not supported by Mr. Taylor's affidavit. His affidavit merely stated:

8. During June and early July 1980, I made a number of requests of various Army field commands for various information relating to the general subject of preparedness. Most commands were responsive to those requests since the information sought was unclassified and routinely available upon request.

There is nothing in Mr. Taylor's affidavit which shows that he had previously obtained MRAR's from the Army and there is no evidence that the Army had previously given this information to other persons. To the contrary, the application for information which was submitted on July 17, 1980, specifically stated:

As you know, Mr. Taylor first attempted to obtain the information, along with other data (authorized and assigned strengths; critical MOS shortages; and end line equipment shortages) through personal or telephone requests of various unit public affairs officers.

In response to the quoted remarks of former Secretary of Defense Brown, General Moore pointed out in his affidavit, that Secretary Brown's remarks were addressed to media articles that discussed the overall readiness of the Army in "quite general" terms and that this general information was of "insignificant value to a potential adversary when compared to the information that the adversaries would acquire through public dissemination of the documents in response to [Taylor's] request."

With respect to the District Court's observation that the Army's refusal to disclose the information may have been based on political considerations, we agree with appellant that political interest in the readiness reports does not establish that release of the information would not have a serious impact on national security.

In sum, we find that the Army affidavits are specific as to the nature of the information sought and the damage its disclosure would pose to the national security. The appellees' allegations challenging the affidavits are not supported by the record.

In view of the knowledge, experience and positions held by the three affiants regarding military secrets, military planning and national security, their affidavits were entitled to "the utmost deference." *Halkin v. Helms*, 194 U.S.App.D.C. 82, 598 F.2d 1, 9 (1978).

We therefore conclude that the District Court erred in holding that "it was improper substantively to classify the measured resource area ratings under Executive Order 12,065."

C. *The Amended Regulation*

On September 22, 1980, AR 220–1, Interim Change # 102, was issued and it provided that:

Unit Status Reports, the overall C-rating, and the C-Rating for each measured area will be classified at least CONFIDENTIAL.

On July 16, 1981, AR 220–1 ¶ 2–7, was amended to contain the same provisions as the Interim Change.

The Army maintains that the District Court should have applied the amended regulation as the law in effect when the case was decided. Appellees argue, as they contended in the District Court, that in view of the provisions of section 1–606 of Executive Order 12,065, the change in the classification could only have been made by the Secretary or Under Secretary of the Army, and this was not done. The District Court noted that the Army did not contend that the change in the regulation was retroactive, and found that the amendment was not relevant.

We find that the record before us is inadequate for the resolution of this issue. On that account and because the case has been disposed of on other grounds, we do not decide the question.

CONCLUSION

It follows from the foregoing opinion that the decision of the District Court is reversed and the case is remanded to that court with instructions to dissolve the injunction and dismiss the complaint.

*Reversed and Remanded.*

APPENDIX

Executive Order 12,065, 3 C.F.R. 190 (1979):

SECTION 1. ORIGINAL CLASSIFICATION.

1-101. Except as provided in the Atomic Energy Act of 1954, as amended, this Order provides the only basis for classifying information. Information may be classified in one of the three designations listed below. If there is reasonable doubt which designation is appropriate, or whether the information should be classified at all, the less restrictive designation should be used, or the information should not be classified.

\* \* \* \* \* \*

1-104. "Confidential" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security.

\* \* \* \* \* \*

1-203. *Confidential.* Authority for original classification of information as Confidential may be exercised only by such officials as the President may designate by publication in the FEDERAL REGISTER, by the agency heads listed below, by officials who have Top Secret or Secret classification authority, and by officials to whom such authority is delegated in accordance with Section 1-204:

The President and Chairman, Export-Import Bank of the United States

The President and Chief Executive Officer, Overseas Private Investment Corporation

1-204. *Limitations on Delegation of Classification Authority.*

(a) Authority for original classification of information as Top Secret may be delegated only to principal subordinate officials who have a frequent need to exercise such authority as determined by the President or by agency heads listed in Section 1-201.

(b) Authority for original classification of information as Secret may be delegated only to subordinate officials who have a frequent need to exercise such authority as determined by the President, by agency heads listed in Section 1-201 and 1-202, and by officials with Top Secret classification authority.

(c) Authority for original classification of information as Confidential may be delegated only to subordinate officials who have a frequent need to exercise such authority as determined by the President, by agency heads listed in Sections 1-201, 1-202, and 1-203, and by officials with Top Secret classification authority.

(d) Delegated original classification authority may not be redelegated.

(e) Each delegation of original classification authority shall be in writing by name or title of position held.

(f) Delegations of original classification authority shall be held to an absolute minimum. Periodic reviews of such delegations shall be made to ensure that the officials so designated have demonstrated a continuing need to exercise such authority.

\* \* \* \* \* \*

1-3. *Classification Requirements.*

1-301. Information may not be considered for classification unless it concerns;

(a) military plans, weapons, or operations;

(b) foreign government information;

(c) intelligence activities, sources or methods;

(d) foreign relations or foreign activities of the United States;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities; or

(g) other categories of information which are related to national security and which

require protection against unauthorized disclosure as determined by the President, by a person designated by the President pursuant to Section 1–201, or by an agency head.

1–302. Even though information is determined to concern one or more of the criteria in Section 1–301, it may not be classified unless an original classification authority also determines that its unauthorized disclosure reasonably could be expected to cause at least identifiable damage to the national security.

\* \* \* \* \* \*

1–606. No document originated on or after the effective date of this Order may be classified after an agency has received a request for the document under the Freedom of Information Act or the Mandatory Review provisions of this Order (Section 3–5), unless such classification is consistent with this Order and is authorized by the agency head or deputy agency head. Documents originated before the effective date of this Order and subject to such a request may not be classified unless such classification is consistent with this Order and is authorized by the senior official designated to oversee the agency information security program or by an official with Top Secret classification authority. Classification authority under this provision shall be exercised personally, on a document-by-document basis.

\* \* \* \* \* \*

6–1. *Definitions.*

\* \* \* \* \* \*

6–102. "Classified information" means information or material, herein collectively termed information, that is owned by, produced for or by, or under the control of, the United States Government, and that has been determined pursuant to this Order or prior Order to require protection against unauthorized disclosure, and that is so designated.

\* \* \* \* \* \*

6–104. "National security" means the national defense and foreign relations of the United States.