AMERICAN JEWISH CONGRESS,
Plaintiff,

v.

DEPARTMENT OF THE TREASURY,
Defendant.

Civ. A. No. 81–1745.

United States District Court,
District of Columbia.

Oct. 27, 1982.

Joel H. Levy, Cohn & Marks, Washington, D.C., for plaintiff.

Kathryn M. Braeman, Sp. Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding under the Freedom of Information Act (FOIA or Act), 5 U.S.C. § 552 (1976), the American Jewish Congress (AJC) seeks to obtain from the Department of the Treasury (Department or Treasury) a copy of a document containing the most recent aggregate figures showing the amount of monies in United States banks deposited by, and the amount of Treasury bills owned or held by, foreign persons from three Arab countries—Saudi Arabia, Kuwait, and the United Arab Emirates. The Department denied the request and relied on two FOIA exemptions: Exemption (b)(3), 5 U.S.C. § 552(b)(3), and Exemption (b)(1), 5 U.S.C. § 552(b)(1).

The parties have fully briefed and argued the legal issues. There are no significant material facts in dispute. The matter is presented to the Court upon the parties' cross-motions for summary judgment.

For the reasons set forth below the Court determines that although Exemption (b)(3) is inapplicable here, Treasury has properly invoked Exemption (b)(1) of the FOIA. The American Jewish Congress' request for the documents, therefore, is denied and the complaint dismissed.

## Background

The material facts may be briefly stated. The Department denied disclosure to the plaintiff on two grounds. First, disclosure of the country aggregates would reveal holdings of specific investors which are government entities. Such disclosure, the Department argues, is specifically prohibited by Exemption (b)(3) of the FOIA, which is applicable to documents "expressly exempted from disclosure by statute." Second, disclosure of the requested information revealing the holdings of government investors would cause identifiable damage to the foreign relations of the United States. This ground invokes Exemption (b)(1) of the FOIA, which is applicable to documents "specifically authorized ... to be kept secret in the interest of national defense or foreign policy." In this connection the government also relied upon Executive Order 12065, 3 C.F.R. 190 (1979).

As to Exemption (b)(3), two statutes are cited by the government: the Bretton Woods Agreements Act (Bretton Woods Act), 59 Stat. 515, 22 U.S.C. § 286f, and the International Investment Survey Act of 1976 (Survey Act), 22 U.S.C. §§ 3101 et seq. Both Acts provide for the gathering of information on foreign investment in the United States. Section 8(a) of the Bretton Woods Act authorizes the President to "require any person to furnish such information as the President may determine to be essential to comply with [a request for information from the International Monetary Fund]," 22 U.S.C. § 286f(a). The International Monetary Fund requires the United States to furnish information on the portfolio investments of foreign investors in the United States. Section 4(c)(1) of the Survey Act requires the President to conduct a "comprehensive benchmark survey of foreign portfolio investment in the United States at least once every five years ...." 22 U.S.C. § 3103(c)(1). In order to collect that information, the Act authorizes the Secretary of the Treasury to promulgate regulations which "may require any person subject to the jurisdiction of the United States ... to furnish, under oath, any report containing information which is determined to be necessary to carry out the international investment surveys and studies conducted under [the] Act." Section 5(b)(2), 22 U.S.C. § 3104(b)(2).

Pursuant to those statutes, the Department of the Treasury's Office of International Financial Reports prepares statistical reports and analyses of the portfolio investments in the United States by foreign residents.[1] The portfolio investment data collected on Treasury's report forms include bank deposits and Treasury bills, the two types of portfolio investment which are the subject of the plaintiff's FOIA request.[2]

Since 1934, Treasury has required banks and other reporters to furnish information on the liabilities of U.S. institutions to "foreigners." The present report forms separately identify portfolio holdings of several broad categories of "foreigners," including "foreign official institutions," "unaffiliated foreign banks," and "all other foreigners." The report forms are submitted to a Federal Reserve bank, where they are then coded into a computer system. Since 1935, the Department has published tables summarizing the information which it has collected.[3]

Prior to 1974, the figures for Middle East countries were published on a country-by-

---

1. Portfolio investment is defined in the Survey Act to mean, in effect, all international investment involving the "ownership or control, directly or indirectly, by one person of [less than 10 percent] of the voting securities of an incorporated business enterprise or an equivalent interest in an unincorporated business enterprise." 22 U.S.C. § 3102(10), (11).

2. Consolidated Supplemental Affidavit of C. Dirck Keyser, Director of the Office of International Financial Reports at the Department of the Treasury (March 26, 1982) at ¶ 4.

3. Id. at ¶¶ 5, 6.

country basis, as is the case with other countries. In 1974 the revenues of oil-exporting countries substantially increased and the Treasury Department began publishing the data for oil-exporting countries in the Middle East and Africa solely on a regional basis. Thus, the Department publishes the aggregate portfolio holdings of Bahrain, Iran, Iraq, Kuwait, Oman, Qatar, Saudi Arabia, and the United Arab Emirates; it does not break down, on a country-by-country basis, these aggregate figures.[4]

On March 12, 1981, the AJC requested access to all Treasury documents relating to the aggregate investment in U.S. banks and purchase of U.S. Treasury bills by individuals or governments in 16 Arab countries.[5] The request was later orally modified to include information on only three countries—Saudi Arabia, Kuwait, and the United Arab Emirates. The Department denied the request and a subsequent appeal.[6] The AJC then sought relief through this FOIA proceeding.

The only Treasury record at issue in this case is a portion of a table titled "Estimated Outstanding Portfolio Investment in the United States of Oil-Exporting Countries as of Year-End 1980."[7] Figures showing country aggregates have been expurgated from that table. The table was prepared in February 1981 and classified "Confidential" on February 2, 1981.[8]

The Department provided two reasons for its decision to withhold the information. First, it stated that the two statutes trigger Exemption (b)(3) and preclude Treasury from disclosing the information sought by the plaintiff. In each of the three Arab countries, the government or governmental financial institutions hold most of the country's portfolio investments. Thus, by revealing the aggregate figure for a particular country's investments, Treasury would, it asserted, indirectly reveal the investment of a particular government or governmen-

tal authority. Both statutes prohibit disclosure of the investments of an individual investor, and, therefore, Treasury concluded that the requested document was exempt from disclosure under FOIA. Second, the Department relied upon Exemption (b)(1) and refused the requested document, asserting that it was protected because of national defense or foreign policy concerns.

### Legal Analysis

As in any FOIA case, the Court is required to "determine the matter *de novo,* and ... the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). A document can only be withheld from the requester if the information falls within one of nine enumerated exemptions. 5 U.S.C. § 552(b). Summary judgment is warranted if the agency affidavits provide the justification for non-disclosure with reasonably specific detail; demonstrate that the information withheld falls logically within the claimed exemption; and are not controverted either by contrary evidence in the record or by evidence of agency bad faith. *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981).

### A.

### The (b)(3) Exemption

Section 552(b)(3) exempts from disclosure matters that are ... specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

In asserting this exemption, Treasury relies on confidentiality provisions contained within both the Bretton Woods and the Survey Acts. The Bretton Woods Act includes two such provisions. Section 8(c), 22 U.S.C. § 286f(c), states:

---

**4.** *Id.* at ¶ 7.

**5.** Complaint, Exh. A.

**6.** *Id.,* Exhs. B, D.

**7.** Defendant's Motion for Summary Judgment, Exh. A.

**8.** Keyser Aff. (Sept. 21, 1981) at 3.

It shall be unlawful for any officer or employee of the Government, or for any advisor or consultant to the Government, to disclose, otherwise than in the course of official duty, any information obtained under this section, or to use any such information for his personal benefit.

In addition, section 8(a), 22 U.S.C. § 286f(a), mandates that no information acquired in response to a request by the International Monetary Fund "shall be furnished to the Fund in such detail that the affairs of any person are disclosed." Treasury argues that if the government cannot disclose the investment of "any person" to the Fund, then clearly such a disclosure cannot be made to the public.

The confidentiality provision of the Survey Act prohibits the publication of "any information collected pursuant to subsection (b)(2) of this section in a manner that the person who furnished the information can be specifically identifiable except as provided in this section." The subsection continues:

No person can compel the submission or disclosure of any report or constituent part thereof collected pursuant to this chapter, or any copy of such report or constituent part thereof, without the prior written consent of the person who maintained or furnished such report under subsection (b) of this section and without prior written consent of the customer, where the person who maintained or furnished such report included information identifiable as being derived from the records of such customer.

22 U.S.C. § 3104(c). The subsection also includes restrictions on access to such confidential information by other agencies in the Executive Branch.

The government's statutory argument is that the information sought by the Ameri-

can Jewish Congress qualifies as "detail" which discloses "the affairs of any person," in the language of the Bretton Woods Act, and as "information identifiable as being derived from the records of [a] customer," in the language of the Survey Act. The premise for the argument is that, beginning in 1974, official governmental authorities in the OPEC countries began to overwhelmingly dominate the portfolio investing within those countries. Because such a large percentage of the portfolio investments from those countries is held by the government, release of the information sought by the American Jewish Congress would be "tantamount to disclosure of the holdings in the United States of particular official monetary or financial authorities in each of these countries." [9]

■ The contention is flawed. First, the premise for the argument is highly questionable. The link between the raw data sought by the plaintiff and the investments held by a particular investor is approximate. Neither Act restricts the release of data which, through approximation or interpolation, might provide a rough idea of the holdings of an individual investor.

■ Moreover, Treasury's argument is particularly unappealing in this case since it is the Department itself which has furnished the data for those students of the world economy who might seek to determine the approximate governmental holdings of these Arab countries. Apparently, it is generally known among international economists that the bulk of the investment from the OPEC countries is made by the governmental authority.[10] However, the most exact statement of the percentage of official investment provided the Court is contained within a document which Treasury submitted to a congressional subcommittee in 1978.[11] The document provides

---

**9.** Consolidated Supplemental Keyser Aff. at ¶ 32.

**10.** *See* Aff. of Charles Schotta, Deputy Assistant Secretary of the Treasury for Commodities and Natural Resources (March 26, 1982) at ¶ 5.

**11.** "Portfolio Transactions in the U.S. by Official Institutions of Mid East Oil Exporters as Proportion of that Country's Total Transactions," Defendant's Motion for Summary Judgment, Exh. B. The document was provided in 1979 to the Subcommittee on Commerce, Consumer and Monetary Affairs of the House Com-

the percentage for five OPEC countries in columns marked "50–60", "60–70", "70–80", and "80–100". Such data are, of course, highly approximate and do not provide the sort of information prohibited by the statutes. But even if the data were more precise, Treasury cannot, in good faith, argue that its release of such information bars it from now publishing another set of data which, were it not for the earlier information, would be publishable. Tolerance of such a subterfuge would wreak havoc with the FOIA.

■ Second, the legislative history of the Survey Act further undermines the statutory argument. The purpose of the Act was to provide "clear and unambiguous authority for the President to collect information on international investment and to provide analyses of such information to the Congress, the executive agencies, and the general public." Section 2(b), 22 U.S.C. § 3101(b). The overall purpose of the Act was to encourage as much disclosure of information on foreign investment as possible.[12] Furthermore, the legislative history of the Act makes clear that Treasury may release "aggregate statistical data", such as that sought by the American Jewish Congress.[13]

■ Finally, Treasury's interpretation and implementation of the requirements of the Acts run counter to the mandate of Exemption (b)(3)(A). Subsection (A) is applicable if the statutes "leave no discretion" as to the release of information. Treasury has adopted a policy, however, of withholding a country aggregate only if (1) disclosure of the country aggregate will reveal the investment of an investor *and* (2) the investor requests that the investment not be disclosed.[14] Thus, even though most of the Canadian portfolio investment, for example, is held by official institutions, aggregate investment data for Canada are published because, according to Treasury officials, the Canadian government has never objected to such publication.[15] Similar data for individual Communist countries are also published, even though the major investor in those countries is the government; apparently such publication is also permissible, under Treasury's rationale, because those countries have never objected.[16] The statutes fit within (b)(3)(A), however, only if the congressional mandate of confidentiality is "absolute and without exception." *American Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C.Cir.1978). Treasury's own implementation of the two Acts belies the application of the exemption.[17]

mittee on Government Operations. Consolidated Supplemental Keyser Aff. at ¶ 30.

12. *See* H.R.Rep. No. 93–1183, 93rd Cong., 2d Sess. 1–3 (1974), U.S.Code Cong. & Admin. News 1978, p. 5957. The report examines the Foreign Investment Study Act of 1974, 88 Stat. 1450, Pub.L. 93–479, which was the predecessor of the Survey Act.

13. *See, e.g.,* 120 Cong.Rec. S34683–84 (daily ed., Oct. 9, 1979) (statement of Senator Inouye).

14. Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 16. The Treasury Department's memorandum cites for this point the testimony of C. Fred Bergsten, Assistant Secretary of the Treasury for International Affairs, in *The Operations of Federal Agencies in Monitoring, Reporting on, and Analyzing Foreign Investments in the United States (Part 2—OPEC Investment in the United States),* House Committee on Government Operations, 96th Cong., 1st Sess. 215 (1981).

15. *Id.* at 214.

16. This information is set forth in H.R.Rep. No. 96–1216, *The Adequacy of the Federal Response to Foreign Investment in the United States,* House Committee on Government Operations, 96th Cong., 2d Sess. 124–25 (1980).

17. Treasury cannot rely on (b)(3)(B), which permits nondisclosure when the statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld." Nondisclosure is permitted under that subsection "if, but only if, the enactment is the product of congressional appreciation of the dangers inherent in a formula whereby the administrator may determine precisely whether disclosure in any instance would pose the hazard that Congress foresaw." *American Jewish Congress v. Kreps*, 574 F.2d at 628–29. No such congressional appreciation or legislative formula in either of the Acts makes available this subsection.

In sum, Treasury's statutory argument lacks support in the statutory language, the legislative history, and the Department's own interpretation and implementation.

## B.
### The (b)(1) Exemption

The Court of Appeals for this Circuit recently summarized the guidelines when an agency claims the (b)(1) exemption.

> [W]hat this Court must consider is "*de novo* determination" of the propriety of the withholding, but in doing so the courts "must 'accord substantial weight'" to the Agency's determinations. *Ray v. Turner,* 587 F.2d 1187, 1194 (D.C.Cir. 1978). Once satisfied that proper procedures have been followed and that the information logically falls into the exemption claimed, the courts "need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith." *Weissman v. Central Intelligence Agency,* 565 F.2d 692, 697 (D.C.Cir.1977). Conversely, "summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Halperin v. Central Intelligence Agency, supra,* 629 F.2d at 148. The test is not whether the court personally agrees in full with the CIA's evaluation of the danger—rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the CIA is expert and given by Congress a special role. *See* S.Rep. No. 93–1200, 93d Cong., 2d Sess. 12, *reprinted in* [1974] U.S.Code Cong. & Ad.News 6267, 6290.

*Gardels v. Central Intelligence Agency,* 689 F.2d 1100, 1104–1105 (1982).

Section 552(b)(1) allows an agency to withhold materials which are

> (A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to an Executive Order; . . . .

The document in question has been designated "Confidential" pursuant to Executive Order 12065. This designation is limited to information "the unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security." § 1–104, 3 C.F.R. at 191.

Section 1–3 of the Order, 3 C.F.R. at 193, establishes the criteria to be applied in determining the propriety of classification. It states that information may not be classified unless it concerns various subject matters, one of which—relied upon by the Department in this case—is "foreign relations or foreign activities of the United States." § 1–301(d), 3 C.F.R. at 193.

The plaintiff's arguments are essentially of four types. First, the AJC argues that the document does not concern "foreign relations or foreign activities of the United States" but, rather, contains data supplied by domestic reporters relating solely to this nation's domestic economy. Second, the AJC claims that even if the information were properly classified, Treasury's power to withhold this document must fall in the face of the Survey Act's requirement of publication. Third, the AJC states that the government's affidavits fail to disclose with reasonable specificity the harm which would result from disclosure. Finally, the AJC asserts that upholding the Department's decision would allow an agency to circumvent the FOIA simply by promising confidentiality of otherwise disclosable documents.[18]

 Neither of the first two arguments need long detain us. First, although

---

**18.** The AJC also asserts that Treasury has not complied with the procedural requirements of Executive Order 12065. However, the Consolidated Supplemental Keyser Aff. at ¶ 35 makes clear that Treasury has satisfied the procedural criteria as set forth in section 1–501 of the Executive Order.

the figures were supplied by domestic banks and other domestic reporters, the document, by its very definition, involves investments of "foreigners". According to the government affidavits,[19] the possibility that this document might be released has provoked considerable anxiety in foreign capitals and thus implicates foreign relations concerns. The AJC cites no support for its contention that the government may solely classify documents under the "foreign relations" category if such documents are in fact furnished by a foreign government. Second, although the Survey Act encourages disclosure of this information, such disclosure is not mandated by that Act. If Congress, in enacting the Survey Act, intended to intrude upon the President's power to protect military and state secrets, derived directly from Article II of the Constitution, then clearly the statute and legislative history would be more explicit. *Cf. United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108–3109, 41 L.Ed.2d 1039 (1974).

The third argument, concerning the specificity of the harm which would result from disclosure, requires a review of the several affidavits submitted. The affidavit of Ralph Edwin Bresler[20] states that he is a country officer for Kuwait and Oman at the Department of State and was formerly chief of the economic section at the American Embassy in Kuwait. He states that "[b]ased on discussion I have had with Kuwaiti officials in charge of their investments overseas, I understand that the Government of Kuwait wishes the total amounts of, and details about, its investments in the United States held in confidence." Marc E. Leland, Assistant Secretary for International Affairs of the Department of the Treasury, states in his affidavit that publication of the data could have worldwide "political" ramifications.

He further states that he is personally aware that Arab officials "wish that information about their investments in the United States be held in strictest confidence."[21]

The first affidavit of C. Dirck Keyser,[22] Director of the Office of International Financial Reports at the Department of the Treasury, is more detailed. Keyser states that he is the official on whose instructions the document was classified "Confidential." He states that:

> The governments in question have on numerous occasions expressed their concern that their investments in the United States be held confidential. The Treasury Department, in part relying on statutory provisions preventing disclosure, has made clear to the governments of the countries concerned, as well as to others, that the confidentiality of their investments in the United States will be maintained and continued. The governments in question have relied on those assurances, as have others. Disclosing the information in question would be a breach of faith by the United States which would not only harm our foreign relations with the countries in question, but could cast doubt on the credibility of our undertakings vis-a-vis other countries.[23]

An affidavit was also submitted by Charles Schotta,[24] Deputy Assistant Secretary of the Treasury for Commodities and Natural Resources. He states that "harm to the national security may be reasonably expected to result from making the requested table public." He adds: "This is principally because, if the data in question are released, the United States Government will have demonstrated to the governments of three Middle East oil exporting countries, Saudi Arabia, Kuwait and the United Arab Emirates, that it is unable or unwill-

**19.** See *infra* at 1277–1278.

**20.** Aff. of September 10, 1981.

**21.** Aff. of October 1, 1981 at 2.

**22.** Aff. of September 21, 1981.

**23.** Keyser Aff. at 3. Keyser's Consolidated Supplemental Affidavit, submitted on March 26, 1982, provides much detail on the background to and history of the Treasury Department's handling of this information but adds nothing to the rationale for the national security exemption.

**24.** Aff. of March 26, 1982.

ing to maintain its commitments and uphold the usual standards of international practice with respect to financial confidentiality." He further states: "Whenever I have heard officials of the three countries in question express their concerns about the release of country-by-country investment data, they have been assured that the United States Government would continue to protect the confidentiality of these data and would continue its current practice, which is to publish area aggregates rather than individual country aggregates with respect to their investments." [25]

In addition, Schotta submitted *in camera* a second affidavit which provides further detail on the harm which might result from release of the document.[26] Resort to the *in camera* affidavit was not strictly necessary, since the public affidavits are sufficient to support the Department's claim. However, in view of the important issues at stake, confirmation of the assertions in the public affidavits was deemed essential. Although plaintiff's counsel sought to review the *in camera* affidavit, the Court determined that the danger to national security warranted counsel's exclusion, particularly since presence of counsel would not be necessary to resolve the AJC's claim.[27]

The AJC asserts that the affidavits state in a conclusory fashion nothing more than that disclosure "would be viewed unfavorably by those with whom we have bilateral relations." [28] Thus, it seeks specific information on such items as the type of retaliatory action likely to result from disclosure. This claim appears similar to that made in *Halperin v. CIA,* 629 F.2d 144, 149 (D.C.Cir. 1980), where an appellant challenged the CIA's projection of potential harm as "pure speculation." The Court commented that "any affidavit or other agency statement of

threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm rather than an actual past harm." *Id.* In this Court's view, a claim of breach of faith, while rather ambiguous and speculative, is sufficiently reasonable and plausible to warrant accession to the expert judgment of the Treasury Department officials.

■ Finally, the Court cannot adopt AJC's argument that the government's rationale would permit the Treasury Department, or any other agency, to "promise its way out of the Freedom of Information Act." [29] Our Circuit Court on at least two occasions has ruled that an agency may withhold a document or documents which would otherwise be disclosable when a foreign government has requested secrecy and when repudiation of that request might impair our foreign relations and thereby impair our national security.

In *Carlisle Tire & Rubber Co. v. U.S. Customs Service,* 663 F.2d 210 (D.C.Cir. 1980), an American company sought to compel disclosure of documents held by the Customs Service relating to Customs' investigation of products exported by the Republic of China and the Republic of Korea. Customs relied on (b)(1) to withhold documents consisting of responses by Korea to questionnaires issued to it by Customs. The responses were transmitted to Customs together with an express Korean government request for confidential treatment. The Court upheld the government's position, stating that:

> To the extent that unauthorized disclosure of these documents would contravene guarantees of confidentiality made to a foreign government, the affidavits

---

**25.** *Id.* at ¶¶ 3, 6.

**26.** The Court of Appeals has recognized that, particularly in national security cases, resort to *in camera* proceedings may be necessary or desirable. *Ray v. Turner,* 587 F.2d 1187, 1211 n. 43 (D.C.Cir.1978); *Phillippi v. CIA,* 546 F.2d 1009, 1012 n. 13 (D.C.Cir.1976).

**27.** *See Salisbury v. United States,* 690 F.2d 966 at 973–74 n. 3 (D.C.Cir.1982).

**28.** Plaintiff's Supplemental Memorandum in Support of Cross-Motion for Summary Judgment at 18.

**29.** *Id.* at 14.

suggest, their revelation would likely damage the foreign relations of the United States, and hence the national security.

*Id.* at 217.

In *Wolfe v. Froehlke,* 358 F.Supp. 1318 (D.D.C.1973), *aff'd,* 510 F.2d 654 (D.C.Cir. 1974), plaintiff sought disclosure of a Defense Department file concerning the forced repatriation of Russian citizens after World War II. The Defense Department had declared that it had "absolutely no objection" to the release of the file. 358 F.Supp. at 1319 n. 1. However, the documents were not released because the British government had refused to concur in the declassification and Defense officials had determined that unilateral disclosure without concurrence of the British government would be "prejudicial to the foreign relations of the United States." The court upheld the Defense Department's action, and the Court of Appeals affirmed.[30]

The AJC seeks to distinguish this proceeding on the ground that the document withheld was generated by a domestic statute and provides information about the domestic economy. Clearly, the AJC is correct in its argument that the document differs from the more typical (b)(1) Exemption case in which the document itself involves national security information and is not transformed into exempt material through a "promise of confidentiality" to a third party. *See, e.g., Military Audit Project,* 656 F.2d at 738–39. There is scant doubt that the Department's assertion of the (b)(1) Exemption in this case is positioned on nothing more than a desire to preserve "special preferential treatment" provided the OPEC countries.[31]

This Court is also mindful, however, of the standard for judicial review of agencies' decisions under (b)(1). Upon review of the entire record, the Department's judgment "survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the [Department] is expert and given by Congress a special role." *Gardels v. CIA,* 689 F.2d 1100. This Court upholds the Department's decision denying the release of the requested document.

An appropriate Order accompanies this Memorandum Opinion.

## ORDER

In accordance with the accompanying Memorandum Opinion, it is this 26th day of October, 1982, hereby

## ORDERED

That plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.

Judgment is entered for the defendant and the complaint is dismissed with prejudice.

---

**30.** Although the district court decided the case prior to the 1974 amendment to (b)(1) requiring, *inter alia, de novo* review of an agency's decision to withhold information, the Court of Appeals' affirmance strongly suggests that the same result would have been reached subsequent to the amendment. 510 F.2d at 655.

**31.** H.R.Rep. No. 96–1216, *The Adequacy of the Federal Response to Foreign Investment in the United States,* House Committee on Government Operations, 96th Cong., 2d Sess. 120 (1980). The report, after an extensive analysis of the issue, concluded that "[t]he United States Government entered into rather specific, explicit agreements with these OPEC governments designed to attract their investments by the promise of special treatment, including maintaining the confidentiality of their U.S. investments." *Id.*